# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

**JOHN H. THORNTON,**

**Petitioner,**

**v.**                                         **1:06-CV-1252**
**(GLS)**

**UNITED STATES,**

**Respondent.**

**APPEARANCES:**                   **OF COUNSEL:**

**FOR THE PETITIONER:**

Office of William Kent              WILLIAM M. KENT, ESQ.
1932 Perry Place
Jacksonville, Florida  32207-3443

Office of Kent B. Sprotbery         KENT B. SPROTBERY, ESQ.
74 Chapel Street
Albany, New York  12207

**FOR THE RESPONDENT:**

HON. GLENN T. SUDDABY              THOMAS A. CAPEZZA
United States Attorney             Assistant U.S. Attorney
445 Broadway
218 James T. Foley U.S. Courthouse
Albany, New York 12207-2924

**Gary L. Sharpe**
**U.S. District Judge**

## Decision and Order

### I. Introduction

After John H. Thornton waived indictment and plead guilty to possessing child pornography, *see* 18 U.S.C. § 2252(a)(5)(B), he was sentenced, *inter alia*, to sixty months imprisonment, supervised release and a fine.  An asset forfeiture order was also entered.  He did not appeal.  By timely motion, he now claims that his plea was involuntary and his plea colloquy was deficient.  *See Pet., Dkt. No. 1*; *see also* 28 U.S.C. § 2255.[1] He seeks to vacate his plea, sentence and judgment, or alternatively,  an evidentiary hearing.  He also moves for bail release and an order authorizing a polygraph examination.  *See Dkt. Nos. 9, 15.*  For the following reasons, all motions are denied.

### II. Background

#### A. The Criminal Conduct

On August 27, 2001, an uncover agent posted an advertisement on an internet site offering to buy, sell or trade erotic, taboo videotapes.[2]

---

[1]"Under the ... [habeas corpus] ... rules, the application for relief is in the form of a motion rather than a petition..."  Rule 2 of the Rules Governing § 2255 Proceedings advisory  committee's note (1976), *foll.* 28 U.S.C. § 2255.

[2]The facts regarding criminal conduct are principally derived from the Plea and Cooperation Agreement ("Plea Agreement"), *Dkt. No. 11-3*, and the Undocketed Presentence Report ("PSR").

Thornton responded, "I am interested in videos with young actors which feature intercourse, oral, etc. ... I would like to see your list starting at the youngest and going up." The agent replied that the videos were illegal because they contained hundreds of clips that "show boys and girls from about 4 to 13 sucking cock, eating pussy, getting fucked and you name it."

Thornton responded, and asked the agent to verify that he was not a police officer. Simultaneously, he purchased eleven tapes: "Lusty Lolita;" "Susie and Her Little Brother;" "Brother and Sister;" "Bare Boys #1;" "First Fuck;" "Lolita's Auntie;" "Mother/Son Incest;" "Pissing Lolitas;" and "Sibling Sex." According to accompanying descriptions, the videos contained naked images of children aged eight to fifteen engaged in sexual acts with other children, juveniles, and with other adults, including: sex; oral sex; masturbation; incest among parents and siblings; an adult male rape of a fourteen year old girl; two men raping a teenage girl; and adults urinating on children.

The agent verified Thornton's order by return e-mail, and offered to consider trades if Thornton would describe his material. Thornton responded that he had thirty (30) hours of material containing, *inter alia*, sexual acts of children aged one to seventeen, oral sex by juveniles on

3

adults, juvenile masturbation, and one clip described as "Mother undresses year old and eats the girls pussy with the girl sitting on her face."

On September 20, 2001, the agents made a controlled delivery of the child pornography to Thornton, and arrested him.  They then executed a search warrant at his home, and seized seven additional videos that generally matched his earlier description of "trade material."  Those videos contained actual images of minors engaged in sexually explicit conduct.  Various computers were also seized, and later forensic examination revealed hundreds of images containing adult and prepubescent children engaged in oral sex, masturbation, bondage, and vaginal penetration with foreign objects.

## B.  The Waiver of Indictment and Plea

Pursuant to the terms of a Plea and Cooperation Agreement, Thornton waived indictment and entered a plea to possession of child pornography on April 19, 2005.  He was represented by retained counsel, Stephen R. Coffey, Esq.  For more than twenty years, the court has been familiar with Mr. Coffey's extensive federal criminal experience, and his excellent professional reputation.

At the beginning of the plea colloquy, the court told Thornton that it

4

would accept his plea only if convinced from his sworn statements that he was pleading voluntarily and with full knowledge of the consequences of his plea. *See Plea Colloquy at 6-7, Dkt. No. 11-2.* Thornton said that he understood the process and the nature of the inquiry. *Id.* He was then sworn, and a dialogue ensued. *Id.*

According to Thornton's sworn statements: he was fifty-seven years old, high school educated, and could read and write English; he had ingested no alcohol, drugs or prescription medications that impeded his comprehension of the proceedings; he had read, understood, and discussed with his attorney the content of the Information and the terms and conditions of the Plea and Cooperation Agreement; he declined the court's offer to further explain any of those terms and conditions, stating that he understood them; he understood his constitutional rights to indictment and trial that he was relinquishing; he understood the court's sentencing authority; he understood his rights to appeal or collaterally attack his plea and sentence, and agreed that he was waiving those rights if his ultimate sentence was sixty months or less; and he unconditionally admitted the facts recited in Paragraph 5 of his Plea Agreement which provided the factual predicate for the court's conclusion that he committed

5

the crime of possessing child pornography.  *See id. at 7-21.*

Immediately thereafter, the following exchange occurred between

Coffey, the court and Thornton:

> The Court:  Are you aware of any promises or inducements leading him to plead guilty in this matter other than what might be contained in the Plea and Cooperation Agreement?
>
> Mr. Coffey: I am aware of none.
>
> The Court: Do you believe he's pleading guilty because it's in his interest to plead guilty?
>
> Mr. Coffey: Yes, Judge.
>
> The Court:  Mr. Thornton, I neglected to ask you those questions.  Has anybody made any promises to you, other than what might be contained in the Plea and Cooperation Agreement?
>
> The Defendant: No.
>
> The Court:  Are you pleading guilty because it's your choice to plead guilty?
>
> The Defendant: Yes, I do.
>
> The Court: And you understand you have a right to continue your not guilty plea?
>
> The Defendant: Yes, I do.

*Id. at 22*.

6

Thereafter, the court stated:

... For all of the reasons that have been discussed between Mr. Thornton and I here this morning, including the details of the Plea and Cooperation Agreement, all of which I have incorporated into the record of these proceedings, whether I've specifically discussed them on the record or not, I believe Mr. Thornton is an intelligent man, he's able to read and write the English language, he understands the nature of these proceedings, he understands the nature of the rights he's giving up as a result of his plea. There are no promises or inducements other than what we have discussed that have compelled his plea. The factual recitation I went over with him in detail, together with the elements of the crime, demonstrate to me that there's a basis for me to believe he's committed the crime. And for all of those reasons, I accept his plea.

*Id.* at 22-23.

After Thornton said that he read and understood his Plea Agreement and discussed it with counsel, and after he declined the court's invitation to explain the terms further, the Agreement was incorporated into the plea colloquy.[3] In Paragraph 15, Thornton agreed that he would not appeal or collaterally attack his plea if his sentence did not exceed sixty months. *See Plea Agreement, ¶ 15, p. 16.* He acknowledged that other than as contained in his Agreement, no promises, agreements or conditions had been entered. *Id. at ¶ 17, pp. 16-17.*

---

[3]Thornton and Coffey signed the Plea Agreement on March 8, more than a month before the plea. *See* Plea Agreement at 17.

7

Regarding asset forfeiture, Thornton acknowledged that he knew and understood that his obligations were limited to those contained in the Agreement and that he understood his obligations. *See Agreement, ¶¶ 1(c), 2(e), 2(g) (sic.), 5(a) (last para.), 12 and 15*. He specifically acknowledged that the assets to be seized were fully delineated in the Information to which he plead, as repeated in Paragraph 15 of the Agreement. *See id. at ¶ 15; see also Information, Dkt. No. 2 (05-CR-115)*.

Thornton never suggested, nor intimated in any way, that his plea resulted from threats of prosecution directed at his wife, or resulted from threats of asset seizure beyond the provisions contained in the Plea Agreement and Information.

### C. <u>Sentencing</u>

Following Thornton's plea, the court ordered a PSR.  During his conversations with probation, Thornton began to distance himself from the admissions he made during the plea colloquy. *See Undocketed PSR, ¶¶ 30-38*, 49.  In fact, he admitted during a second probation interview that he lied during an earlier interview. *Id. at ¶ 38*.  So too, his current wife of five years, Kathleen Thornton, sought to defend his conduct. *See id. at ¶ 64*. Prior to sentencing, Thornton was evaluated by  Dr. Richard Hamill, a

8

mental health professional, who concluded that Thornton was intelligent and manipulative. *See id. at ¶ 67*. Lastly, Thornton orchestrated the submission of numerous letters from family, friends and acquaintances, most of which intimated that it would be a travesty of justice to incarcerate him because he was actually innocent. *See Sentencing Tr. at 30-36, Dkt. No. 28 (05-CR-115)*. While the characterization of the letters' content reflects the court's personal review of the actual letters, that characterization was also aptly summarized by a Thornton relative in a victim impact letter accompanying the PSR:

> It is even more mind boggling now, how many Thornton has convinced, including members of my own family, that this case has been some sort of elaborate plot to set him up. Another explanation is that his admission of guilt was precipitated by a culmination of an incredible series of coincidences beginning with material he found at his deceased brothers home.

*See Batto Ltr. Accompanying Undocked PSR*.

Batto's letter supported another victim letter submitted by his niece - Kathleen Thornton's daughter and Thornton's step-daughter. In the letter, the step-daughter recited instances of molestation by Thornton over more than a four year period. She also disclosed, as did her uncle, that her mother refused to believe the allegations, supported Thornton instead, and

directed her teen-aged daughter to leave home.[4]

The court's statements during sentencing are pertinent to its current assessment of Thornton's credibility:

> I have spent a considerable amount of time with this file and I have read, in detail, each and every letter that's submitted on your behalf – I presume by a variety of people sitting in this courtroom.  I have no reason to doubt anything any of these folks have said in their letters.  I believe everything they have pointed to on your behalf they believe...

> There are certain things, however, that permeate those letters and what permeates those letters is don't compound the injustice that's already occurred for reasons you have explained to them that you possessed this material you possessed.  And you have hoodwinked them, just like you tried to hoodwink Probation and just like you're sittin' here tryin' to hoodwink me now.

> When I read this stuff, when I look at what the true facts are here, which you could not have told these people – either that, or they're as big an idiot as you are, they don't know the true facts.  You've lied to them, like you've lied to yourself, like you've lied to your wife, like you've lied to everybody in your life.  I look at you and I'm reminded of Robert Louis Stevenson's Dr. Jekyll and Mr. Hyde.  Let's look at the truth here, not what you claim in your letters or what you've told them...

---

[4]The court recites these events only as they relate to current issues of credibility.  At sentencing, the step-daughter was present, but did not wish to testify.  On behalf of Thornton, Mr. Coffey vehemently denied the accuracy of the underlying allegations, and the court declined to consider the information as a sentencing factor even though it credited its veracity.  In the context of the current motion, the events and the court's conclusion regarding them are relevant to an assessment of the credibility of both Mr. and Mrs. Thornton.

You tell the world, your friends and neighbors, that you cooperated with the police. You did not cooperate with the police. You provided them nothing of substance, which is why the Government declined to make a motion for substantial assistance and offered its reasons for doing so, and there isn't anything in there you can controvert.

What you have done since your plea of guilty during the preparation of this entire sentencing process is to do exactly what you've done to your friends, your neighbors and your family. You've stood there and you've tried to disown everything you sat here and admitted at the time of your plea. "It's really not me," "I really didn't do any of this." Well, the facts are otherwise. They aren't conclusions; they're facts. And the facts are that you were dabbling in kiddie porn – serious, nasty kiddie porn. You are Dr. Jekyll and you are Mr. Hyde.

*See Sentencing Tr. at 30-36.*

### D. The 2255 Motion

The only fact sworn to by Thornton in his motion is that the government threatened to arrest and prosecute his wife without probable cause.[5]  *See Pet., Dkt. 1.*  In an accompanying legal memorandum, Thornton's attorney adds: the government further threatened that they would seize all of Thornton's assets; the government stated that it would execute its threats if Thornton did not plead and cooperate; the government's threat was communicated to Thornton through his attorney;

---

[5]Arguably, that fact is unsworn because Thornton failed to properly complete the perjury certification.

11

and Thornton would not have plead guilty absent the threat directed at his wife. *See Thornton MOL at 4-5, 15, Dkt. No. 2.*[6]

After preliminary review of Thornton's motion, the court ordered expansion of the record. In an affidavit, Mr. Coffey swore that the government never threatened to charge or prosecute Mrs. Thornton, that Thornton never indicated that he intended to plead guilty to spare his wife, and that her status as a potential defendant was not an inducement for Thornton's plea. *See Coffey 12/28/06 Aff. at ¶¶ 4-6, Dkt. No. 11-4.* The government responded with affidavits from the prosecutor, Thomas Spina, Jr., and the case agent, Postal Inspector Paul E. Blum. *See Spina 1/29/07 Aff., Dkt. No. 11-6 ("Spina Aff."), and Blum 1/23/07 Aff., Dkt. No. 11-5 ("Blum Aff.").* Blum swore that he never threatened to seize Thornton's assets nor did he threaten to arrest or prosecute his wife. *See Blum Aff. at ¶ 4.* Spina similarly swore that there were no threats to arrest or prosecute Mrs. Thornton, nor were there threats to seize Thornton's assets. *See Spina Aff. at ¶ 3.* Spina further swore that Thornton's negotiated plea limited his exposure to sixty months, rather than eighty-seven months that

---

[6]The court recognizes that 2255 motions may be signed on behalf of the movant under appropriate circumstances. *See* Rule 2(b)(5) of the Rules Governing § 2255 Proceedings, *foll.* 28 U.S.C. § 2255; see also Rule 2(b)(5) advisory committee's note (2004).

might have been applicable had he admitted receipt instead of possession of child pornography.  *See id. at ¶ 4*.  Spina also noted that the extent of Thornton's exposure to asset forfeiture was fully delineated in the Plea Agreement.  *Id. at ¶ 3*.

Thornton replied with an affidavit from his wife, *see Kathleen Thornton 2/09/07 Aff. ("Kathleen Thornton Aff."), Dkt. No. 17*, and another memorandum signed only by his attorney, *see Kent Resp., Dkt. No. 18*.  In her affidavit, Mrs. Thornton swore that Mr. Coffey told both her and her husband that if Thornton did not plead, the government could arrest her and seize all of her husband's assets.  *See Kathleen Thornton Aff. at ¶ 4*.

## III.  Discussion

Thornton asserts two claims in support of habeas relief:  first, his plea was involuntarily induced by threats; and second, the plea colloquy was defective.  While he argues that the two claims are factually and analytically distinct, the court disagrees.  Because the legal analysis of the second is impacted by the court's factual conclusions regarding the first, they are interrelated.  As to the first claim, and for reasons the court will recite, Thornton and his wife have no credibility which results in the factual conclusion that there were no threats issued by the government or his

attorney.  Accordingly, Thornton has failed to prove that his plea was involuntary.  As to the second claim, the plea colloquy was legally sufficient.  Nonetheless, and alternatively, there was no procedural defect in the proceeding nor other error that impacted Thornton's rights or otherwise resulted in a miscarriage of justice.

## A.  <u>The Voluntariness of the Plea</u>

As relevant, 28 U.S.C. § 2255 provides:  A prisoner in custody under sentence of a court ... claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution ... may move the court which imposed the sentence to vacate, set aside or correct the sentence.  Thus, the statute provides relief "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in [a] complete miscarriage of justice."  *Graziano v. U.S.*, 83 F.3d 587, 590 (2d Cir. 1996) (per curiam).  A plea induced by improper threats is involuntary and unconstitutional.  *See Brady v. U.S.*, 397 U.S. 742, 755 (1970); *Boykin v. Al.*, 395 U.S. 238, 242-43 (1969); *U.S. v. Malcolm*, 432 F.2d 809, 814 (2d

14

Cir. 1970).[7]  Thornton has the burden of proving his claim by a

preponderance of the evidence.  *See Harned v. Henderson*, 588 F.2d 12,

22 (2d Cir. 1978).

As evidenced by § 2255's statutory language and accompanying

rules, the process employed to resolve habeas motions depends in large

measure on the nature of the claims and the factual support for them.

Thus, the statute provides:

> Unless the motion and the files and records of the case
> conclusively show that the prisoner is entitled to no relief, the
> court shall cause notice thereof to be served upon the United
> States attorney, grant a prompt hearing thereon, determine the
> issues and make findings of fact and conclusions of law
> thereto...
> A court may entertain and determine such motion without
> requiring the production of the prisoner at the hearing.

28 U.S.C. § 2255; *see also* Rules 4-8 of the Rules Governing § 2255

Proceedings, *foll.* 28 U.S.C. § 2255.  After initial review of the motion and

underlying record, the court must determine whether the movant is entitled

to relief.  If not, the motion should be dismissed.  *See* Rule 4 of the Rules

Governing § 2255 Proceedings, *foll.* 28 U.S.C. § 2255 (Preliminary

Review); *see also Malcolm*, 432 F.2d at 812.  If the motion survives

_____

[7]For purposes of this decision, the court assumes that Thornton's plea was involuntary if
induced by threats to prosecute his wife.

15

preliminary review, the court must seek a response from the United States

Attorney and take any other appropriate action. *See* Rule 4 of the Rules

Governing § 2255 Proceedings, *foll.* 28 U.S.C. § 2255. After receipt of a

response and reply, the court has discretion to supplement the record

through discovery, expansion of the record or an evidentiary hearing. *See*

Rules 5-8 of the Rules Governing § 2255 Proceedings, *foll.* 28 U.S.C. §

2255.

The court's discretion, however, is not limitless. When constitutional

claims involve off-the-record matters, it is unlikely that resort to the

motions, files, and records of the court will facilitate resolution.

Accordingly, summary dismissal is inappropriate under Rule 4, and the

record should be expanded. *See Chang v. U.S.*, 250 F.3d 79, 85 (2d Cir.

2001); *see also* Rule 4 of the Rules Governing § 2255 Proceedings, *foll.* 28

U.S.C. § 2255. Record expansion, however, is not synonymous with a full

evidentiary hearing. As the Circuit has said:

> [A]lthough a hearing may be warranted, that conclusion
> does not imply that a movant must always be allowed to appear
> in district court for a full evidentiary hearing if the record does
> not conclusively and expressly belie his claim, no matter how
> vague, conclusory, or palpably incredible his allegations may
> be. The language of the statute does not strip the district
> courts of all discretion to exercise their common sense.

16

> Indeed, the statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal appearance of the prisoner.

*Chang*, 250 F.3d at 85 (citing *Machibroda v. U.S.*, 368 U.S. 487, 495 (1962)); *see also Pham v. U.S.*, 317 F.3d 178, 191 (2d Cir. 2003) (Kaplan, concurring).

When deciding whether an evidentiary hearing is necessary to resolve credibility issues or develop the facts, courts have been influenced by various factors:  their evaluation of the entire record, not just the plea colloquy (*see U.S. v. Dominguez Benitez*, 542 U.S. 74, 80 (2004) (citing *U.S. v. Vonn*, 535 U.S. 55, 74-75 (2002)); the timeliness of the constitutional complaint (*see Vonn*, 535 U.S. at 72 (citing Federal Rule 32(e), the precursor to current Rule 11(d)(2), as favoring a timely complaint made before sentencing because it separates "meritorious second thoughts" from "sour grapes over a sentence" at a time when genuine mistakes can be corrected easily)); whether the movant remained silent rather than speaking when a mistake could have been fixed (*see id.* at 73); the clarity of conversations between the court and movant (*see U.S. v. Torrellas*, 455 F.3d 96, 103-04 (2d Cir. 2006)); whether the movant's factual assertions are self-serving, corroborated or credible (*see Rosario-*

17

*Dominguez v. U.S.,* 353 F. Supp. 2d 500, 518-19 (S.D.N.Y. 2005);

*Gonzalez v. U.S.*, No. 3:03-CV-0026, 2006 WL 463108, at *2 (N.D.N.Y.

Feb. 24, 2006) (convicted felon attempting to avoid a lengthy sentence has

ample reason to be less than truthful)); and whether factual assertions are

made under oath (*see Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).

Here, the record has been sufficiently expanded to allow the court to

evaluate the credibility of Thornton and his wife. For a variety of reasons,

neither is credible. First, Thornton has never denied that he possessed

child pornography during any court proceeding, nor has he ever officially

claimed actual innocence. Indeed, it is difficult to discern how he could

deny guilt given the underlying facts, his admissions when arrested, the

evidence seized pursuant to warrant, and his factual admissions during his

plea. Before his arrest, he bargained with an uncover police officer to

purchase videos containing child pornography, he bought them after first

seeking to trade other child pornography he said he possessed, and he

was arrested when the child pornography was delivered to him. When

arrested, he admitted the crime. When warrants were executed, other child

pornography was seized from his home that fit the description of that which

he said he had to trade. Nonetheless, by the time of sentencing, the record

18

clearly demonstrates that he had lost all credibility with the court because of his efforts to disown his conduct and prior admissions, and hoodwink all around him. Nothing in his current motion persuades the court that its original credibility assessment was erroneous.

Had the government indicted Thornton on the basis of the other material found in the home, he would have confronted a charge of interstate receipt of child pornography in addition to possession which, in turn, would have escalated his sentencing exposure. Confronting that reality, he appeared in a vacant courtroom free of extended friends, family and bystanders, and admitted the crime during his plea colloquy.

Throughout the proceedings that followed, he used a web of half-truths, lies and deceit to distance himself from his admissions. Pursuant to his Plea and Cooperation Agreement, he was interviewed by the case agent. As evidenced by the government's declination to move for a substantial assistance departure, there was nothing Thornton had to offer by way of assistance. Yet, he continually suggested the opposite to his family and friends. Furthermore, and despite the opportunity presented by direct contact with the agent, Thornton never broached the topic of threats to prosecute his wife or seize all of his assets. So too, he now concedes

that no such threats were ever made by the government.

During Probation interviews, Thornton minimized his criminal conduct and later admitted that he lied during an earlier interview.  Before sentencing, the court received numerous letters clearly reflecting Thornton's continued charade concerning his culpability.  During the interval between plea and sentencing, there was no intimation, by Rule 11(d)(2) motion or otherwise, that any threats had induced his plea.[8]  And, as earlier detailed, issues of credibility arose during the sentencing proceeding itself regarding Thornton's conduct with his step-daughter.  The combination of events is precisely what lead the court to characterize Thornton as "Dr. Jekyll and Mr. Hyde."  Still, there is more.

Thornton retained Mr. Coffey in January 2002, plead guilty on April 19, 2005, and filed his § 2255 motion on October 13, 2006.  October 13 was the first time he asserted that his plea eighteen months earlier was induced by the threat that his wife would be prosecuted as communicated to him by Mr. Coffey.  Obviously, Mr. Thornton contends that the threat, itself, was made sometime between eighteen months and four and one-half

---

[8]Including threats directed at his assets when the true facts concerning his exposure were fully delineated in the PSR which Thornton admitted he had received and read before sentencing.

20

years before he raised it for the first time, and then only when he had

served one of a five year sentence.  So too, and as the court later

concludes, the plea colloquy provided Thornton every reasonable

opportunity to reveal a threat, if one actually existed.  He did not.

The method employed by Thornton to raise his § 2255 factual claims

also reflects on the credibility the court attaches to those claims.  The only

actual assertion directly acknowledged by Thornton is that the government

threatened to arrest and prosecute his wife.  *See Pet., Dkt. No. 1.*  And, as

to that sole assertion, Thornton did not even properly execute the perjury

declaration.  *Id. at unnumbered p. 11.*  Furthermore, he has made no sworn

claim that the government threatened to seize all of his assets, an

argument he raises in his legal memorandum.  Thornton has filed no

personally sworn affidavit or declaration that reveals how, where, when, by

whom, or under what circumstances such threats were made.  In response,

the government filed sworn affidavits from the prosecutor, the case agent

and Thornton's attorney, each stating that his allegations were untrue.

Replying to the government affidavits, Thornton filed another legal

memorandum stating that the threat to arrest his wife was obviously not

made by the government, but instead was falsely communicated to him by

21

his lawyer. A fair reading of his reply and subsequent admissions also indicates that he abandoned his first argument that there was also a threat to seize all of his assets. To corroborate his claim that his lawyer communicated a threat, he submitted an affidavit of his wife to that effect.

Thornton's credibility regarding a threat to his assets is questionable given the forfeiture recitation in the Information which he admitted he read, his sworn admissions during the plea colloquy regarding the forfeiture terms of his Plea Agreement which he conceded he read and understood as a result of discussions with his attorney, and his refusal to accept further clarification from the court. Even a casual review of the Plea Agreement and Information reveals that the specifics of his forfeiture obligations were fully detailed and are clearly contrary to his current claim, especially since his current claim is not supported by sworn assertions. Lastly, because Thornton has coupled his asset seizure assertion which is so devoid of merit, credibility and common sense with his threat to arrest assertion, the credibility of the latter is diminished.

The only sworn support for Thornton's claims is his wife's affidavit. The court has already detailed its serious questions about her judgment and integrity given the underlying proceedings. She sided with her

22

husband and ordered her daughter from their home, resolving questions of credibility in Thornton's favor as those questions related to molestation of her daughter. To the contrary, the court credited the daughter's statements. Furthermore, Kathleen Thornton has ignored the underlying criminal conduct of her husband, and sought to defend him in her communications with both probation and the court. Summarizing the court's view of her credibility and by analogy, the court is reminded of Judge Posner's statement: "It is easy enough to produce an alibi witness, especially if one is blessed with many relatives[.]" *Thompkins v. Cohen*, 965 F.2d 330, 333 (7th Cir. 1992).

Lastly, the court cannot ignore its prior professional experience with both Mr. Spina and Mr. Coffey. Both have sound professional reputations in the federal community, and neither has ever done or said anything in the court's presence that would cause the court to question their integrity. On the other hand, the court is satisfied that the state of the current record is sufficient to support the conclusion that John and Kathleen Thornton have no credibility. Accordingly, there were no threats that induced Thornton's plea, and the court needs no evidentiary hearing to reach that conclusion.

### B. The Rule 11 Colloquy

23

"The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)); *see also Boykin*, 395 U.S. at 242-43 (United States Constitution requires that guilty plea be knowingly and voluntarily entered); *Parke v. Raley*, 506 U.S. 20, 29 (1992) (plea is valid when it is both knowingly and voluntarily made). Voluntary in this context means that the decision to plead was not the product of actual or threatened physical harm, mental coercion, or the defendant's inability to weigh his options rationally. *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988).

Generally, the Circuit requires strict adherence to Rule 11 of the Federal Rules of Criminal Procedure because compliance has a direct bearing on the requirement that a guilty plea is made voluntarily and with knowledge of the alternatives. *See U.S. v. Harrington*, 354 F.3d 178, 183 (2d Cir. 2004). However, the Circuit has cautioned:

> [W]hile Rule 11 imposes strict requirements on what information the district courts must convey and determine before they accept a plea, it does not ... tell them precisely *how* to perform this important task in the great variety of cases that ... come

24

> before them. What is essential ... is that the court
> determine by some means that the defendant
> actually understands the nature of the charges.
> And in all such inquiries, matters of reality, and not
> mere ritual, should be controlling.

*Torrellas*, 455 F.3d at 102-03 (internal citations and quotations omitted and

emphasis in original). There is no question that Rule 11 requires the court

to engage a defendant in conversation and ascertain that his plea is

voluntary; namely, free of force, threats and promises. *See* FED. R. CRIM.

P. 11(b)(2). "But the Rule does not say that compliance can be achieved

only by reading the specified items in haec verba." *U.S. v. Saft*, 558 F.2d

1073, 1079 (2d Cir. 1977). Here, a fair reading of the entire underlying

record reflects that the court accomplished that task. *See Vonn*, 535 U.S.

at 74-75 (holding that Rule 11 compliance should be evaluated from the

entire underlying record).

Given the court's factual conclusion that Thornton was not

threatened, the sole question is whether the record below supports the

view that Thornton's plea represented a voluntary and intelligent choice

among the alternative courses of action open to him. He was certainly

entitled to persist in his not guilty plea and submit his fate to a jury, advice

unquestionably communicated orally by the court and in his Plea

25

Agreement.  While he may now be dissatisfied with the choice he made, it is clear that had he elected not to plead, the government would have pursued charges of receiving child pornography which would have significantly escalated his sentencing exposure.

It is also clear - at least to this court - that Thornton absolutely knew that the court would not accept his plea if it was not voluntary.  The court specifically told him so, and Thornton specifically swore under oath that he understood what the court explained.  The word voluntary means:  "Done by design or intention.  Unconstrained by interference; not impelled by outside influence; spontaneous; acting of oneself.  Proceeding from the free and unrestrained will of the person.  Produced by an act of choice.  Resulting from free choice without compulsion or solicitation."  *See Gutierrez-Fernandez v. U.S.*, Nos. 99 Civ. 4484, 2000 WL 1559945, at *6 n.6 (S.D.N.Y. Oct. 18, 2000) (quoting Black's Law Dictionary 1575 (6th ed. 1990)).  Having ascertained that Thornton was an intelligent man and represented by experienced counsel, the court had every expectation that Thornton understood his conversation with the court.  There is nothing in the underlying record to suggest the contrary.

Furthermore, and in the same context, the court specifically asked

26

whether anything "induced" his plea, to which he responded, "No," followed by his acknowledgment that it was his choice to plead guilty. *See Plea Colloquy* at 6-7, 22-23. While those bent on advocacy may parse words as they choose, the court believes that there is a common understanding in English discourse when one uses the word "induce." Merriam Webster defines it as to "move by persuasion or influence," and defines "inducement" as "a motive or consideration that leads one to action." Merriam Webster's Collegiate Dictionary 594 (10th ed. 1993). The court believes that anyone of ordinary intelligence who was being questioned by a judge while under oath about whether a decision he was making reflected his voluntary choice would answer "no" if, in fact, the choice was induced by threats. Of course, the corollary is also true. If there were no threats, there would be no reason to suggest otherwise, at least at the time of the plea. Accordingly, there was no Rule 11 violation.

Even if the court assumed Rule 11 noncompliance, Thornton still has no § 2255 recourse given the court's conclusion that there were no threats that induced his plea in the first place. Rule 11(h) specifically provides that variance is harmless if substantial rights are not affected. While the parties rightfully argue about the impact of Rule 11(h) in the procedural context of

27

this motion, the Supreme Court has clearly held that § 2255 relief is unavailable where the only issue is the failure to comply with Rule 11's formal requirements. *See U.S. v. Timmreck*, 441 U.S. 780, 785 (1979). Instead, Thornton must show that Rule 11 error existed, and it resulted in a complete miscarriage of justice or in a proceeding inconsistent with the rudimentary demands of fair procedure. *Id.* at 784. His effort in that regard relies on his recitation of threats the court has already discounted as non-credible.[9] Otherwise, the procedure below was fair and there has been no miscarriage of justice.

## IV.  **Conclusion**

For the reasons stated, Thornton's § 2255 motion (*Dkt. No. 1*) is denied in its entirety, and this action is dismissed. Furthermore, Thornton's motions for release on bail and for a polygraph examination (*Dkt. Nos. 9, 15*) are denied as moot.[10]

---

[9]This observation supports the court's earlier comment regarding the interrelationship of the two claims in Thornton's motion. So too, Thornton makes assertions - again unsworn and contained only in a legal memorandum - about the course of action he would have taken had there been no threats. Naturally, those assertions have no credibility because there were no threats and he took no such action.

[10]Regarding the polygraph examination, the court also observes that it would not admit such evidence in any event. *See Government's Polygraph Response, Dkt. No. 16, and authorities cited therein.*

Albany, New York
October 26, 2007

Gary L. Sharpe
Gary L. Sharpe
U.S. District Judge